*PACKWOOD* vs. *WALDEN.*

APPEAL from the court of the first district.

MATTHEWS, J. delivered the opinion of the court. According to the tenor and conclusion of the petition, this action appears to have been instituted for the purpose of causing the defendant to be dispossessed of certain lots of land which he holds on the batture or alluvion, in front of the fauxbourg St. Mary: and to compel him to abate, as nuisances, certain buildtings and inclosures which he has lately erected thereon: also, to obtain a decree, declaring that a part of said alluvion which lies in front of a lot on ——— street, owned by the plaintiff, to be public property, free and open to the use of all, &c.

The petition contains a history of the establishment of the fauxbourg, by the person who last owned the plantation, or farm, on the front of which it was founded; with allegations that no batture or alluvion existed at the time the front of said plantation was changed into a fauxbourg; that the river, at high water, flow-

By the formation of the batture of the fauxbourg St Mary, the place it occupied ceased to be a part of the port. After the change, it became the property of the city.

VOL. VII. N. S.          11

ed up to, and washed, the levee adjoining the front street of said fauxbourg, to which boats and other craft used in navigation, made fast, &c. That in truth the space now occupied by the alluvion, was then a part of the port of New-Orleans; was public property, and still continues to be such, notwithstanding the present extent and elevation of the new made land. The petitioner claims no right of property in the disputed premises, but seems to insist on one of servitude—a right of way direct to the river.

The defendant, in his answer, sets up title to the property, and obtained a judgment in his favour in the court below, from which the plaintiff appealed.

The batture, or alluvion, concerning which the present dispute was raised, has been a most fruitful source of litigation during the last twenty-four years. The questions in relation to it have heretofore assumed various shapes, according to the pretensions of the different parties who claimed it for themselves. This is the first time it has been claimed for the public; that is, as public property, the use of which belongs to all, the right of soil to none, either individuals or bodies politic.

The first title under which this property was

claimed, is that supported in favour of the heirs of Bertrand Gravier, by a judgment of the superior court of the late territorial government. The decision in that case, so far as relates to facts, is based on evidence which proves that a batture in front of their ancestor's plantation, existed to the whole extent of said front, capable of being reclaimed from the river, and was a proper subject for private ownership at the time he established the fauxbourg St. Mary.

The next case in which the rights and titles of individuals were brought in question relative to this batture, is that of *Morgan* vs. *Livingston*. The controversy was between the proprietor of a front lot, who claimed by right of alluvion, and a purchaser from the heirs of B. Gravier. Testimony was introduced which shewed that no alluvion existed at the time of the sale from the original owner to his immediate vendee. Nothing in the evidence established the period when the alluvion might have been considered of sufficient elevation and extent to become private property. The cause was decided on principles applicable to rural estates; and the plaintiff succeeded,

A case occurred between Herman and the claimants under B. Gravier's heirs. This was submitted to a jury on special facts; and their finding proved that the claimant was not a riparious proprietor; and consequently he failed in his pursuit.

In these decisions there is an apparent contradiction. This is a consequence of the evidence which varied in each case. One among the greatest difficulties which occurs in the administration of justice, arises frequently from the incorrectness of witnesses, caused by forgetfulness, prejudice, and perhaps too often by motives more corrupt.

The present case presents no question of title personal to the plaintiff; a circumstance which relieves us in a great degree from weighing the immense mass of testimony offered on his part. In this respect it differs from all those already adjudged relating to the same subject; consequently none of the former judgments can be effectually opposed to it as *res judicata*.

The numerous points filed by the counsel for the appellee, may be fairly comprised in one or two questions of law:

1st. By the formation of the batture, did the

place which it occupied, cease to be a part of the port of New-Orleans?

2d. If so, after the change did it still continue to be public property, unalienable and unalterable in its destination, by any power except that of the state, or of the U. States?

The claim made by the plaintiff, of a servitude, proposes a third question, as to his right in this respect, which will be also considered. The positive titles or rights to the property in relation to the city, the front proprietors, and the representatives of B. Gravier, will be left out of view so far as they might conflict; for if the batture was acquired under legal claims by all or one of these parties, the plaintiff must fail in the present suit.

Previous to entering into the solution of these questions, it is proper that we should put at rest a difficulty arising from acts of the legislative power of the state—one passed in 1808, the other in 1813, which seem to conflict. The first of these laws contains a prohibition to all the inhabitants of the state, preventing them, under certain penalties, from making *levees* or dykes in front of those which existed at the time of passing the act; unless by authorisation of a jury of twelve inhabi-

tants, proprietors of plantations situate on the banks of the Mississippi. The law of 1813 contains general rules for the administration of parochial affairs in all the parishes of the state, under the superintendence of the judges of the different parishes, and police juries to be appointed as directed by the act. Among the powers granted to these political bodies, is that by which they have the entire regulation of roads and levees within their respective districts, both in relation to original creation and reparation of those already existing. The 7th section of this act excludes the city from the authority of the police jury of New-Orleans, and makes it the duty of the corporation to exercise (within its limits) the functions committed by law to police juries.

We are of opinion that the act of 1808, which required the permission of a *special jury* to authorise the erection of new levees, is abrogated by that of 1813, whether the last law be considered as affecting the levees in the country or city. Police juries are empowered to legislate upon roads and levees, both in making and repairing. A power *to make* is distinguishable from one *to repair*, by the authority which it confers to create *de novo.*—

The power granted, by the first law, to spe-
cial juries, to permit the creation of new levees
is similar, in all respects, to that granted by
the last to police juries. These powers are
equal and opposite, and must destroy each
other, unless one of them can be made to yield;
which may be done by a common and well
established rule for the interpretation of the
laws; *leges posteriores abrogant priores.*—
The right of special juries to interfere in the
creation of new levees being thus annulled and
transferred to the police juries throughout the
state, it follows, as a necessary consequence,
that the city council now possess all powers
proper to be used, in the exercise of a just po-
lice, relative to streets, levees, and all other
public places belonging to its community.
The powers of the corporation have, under
the act of 1813, enabled its representatives to
make the compromise which took place be-
tween them and the different claimants of the
batture, by which the embankment or levee of
the river received the direction which it now
has.

We will now investigate the matters on
which depends a correct solution of the ques-
tionsp roposed. And here it may be said,

without impropriety, that the statement itsel of the first proposition, seems to involve an absurdity. Land, according to any definition, can never be considered as making a part of a port. A bank, quay, or wharf, is a necessary appendage to it; and, according to the jurisprudence of this state, is always public and destined to the use of all, as well as the port itself. But this public use cannot legally be extended farther than the bank or wharf, which s always distinct from alluvion fully formed, and subjected by law to the ownership of private individuals or public bodies.

By the Roman law, a port is defined to be *locus conclusus, quo importantur merces, et unde exportantur.* *D.* 50, 16, 59.

The definition in the 8th law, tit. 33, part. 7, is nearly similar to the Roman Digest.

That found in the *Curia Philippica*, page 456, no. 35, states a port to be a place either on the seacoast or on a river, where ships stop for the purpose of loading and unloading, from whence they depart, and where they finish their voyages.

It is clear, from these definitions, that the place now occupied by the alluvion in front of the faubourg St. Mary, although formerly a

part of the port of New-Orleans, has long since ceased to be such. It is nearer to the port than other squares of the city situated farther from the river, but makes no more a part of it than they do. Reliance was had on the plan of the faubourg made by B. Gravier, to prove that the batture in front was destined for public use; in other words that it was designated as a public place. That such was not the intention of the founder, is evident from his having sold his right to a part of the alluvion to one or two of the purchasers of lots from him. The manner in which this place is marked out on the plan, indicates that it was done rather to shew the peculiar localities which were about to be changed into a town, than for any other purpose.

The second question is one of greater difficulty. Doubts may be fairly entertained whether the change of the limits of the port, effected by alluvion and accretion, did not leave the land thus raised public property in the most extensive sense of the terms—subject to have its destination altered only by the supreme legislative power of the state, or that of the United States.

In order to arrive at a correct decision rela-

Eastern Dist.
June, 1828.

PACKWOOD
vs.
WALDEN.

tive to these doubts, we are compelled to examine the doctrine of alluvion, so far as it affects the rights of cities. We have not been able to find any law very explicit on the subject According to the law of the Roman digest *in agris limitatis,* although the right of alluvion is denied to fields of this description, yet it is granted to land on which a city is founded.

The 6th law of the 28th tit. Part. 3, declares that rivers, ports, public roads and places, belong to all men in common; and that the use of the banks of rivers is common to all, altho' the right of property may be vested in particular owners. The law 9th, same title and part. recognizes battures on the banks of rivers, *arenales que son en las riberas de los rios,* as common property of the cities or towns to which they become attached.

Things destined and appropriated absolutely for public and general use, whether they appertain to a state at large, or to a subordinate community, such as a city or town, cannot be legally sold, alienated, or applied to private purposes. These are rivers, fountains, roads, public places, and similar objects. Perhaps this general use might be changed or restricted in some instances by the sovereign power of the state. See *Part. 5, tit. 5, law* 15.

But those things which are the common property of a city, *la quæ sunt propria civitatis, et quæ non sunt in usu publico, vendere potest civitas*, &c. Second note of Lopez on the last law cited.

In conformity with the provisions of the law first invoked, it must be inferred that a city can acquire *jure alluvionis*; and land thus added becomes the property of the whole community; it is *propria civitatis*, and may be sold, alienated, and destined to private uses, by the legal authorities of the city.

According to this examination of the cause, it is readily seen that if the city did really acquire the alluvion in question, the mayor and common-council had power to lay it out into squares and lots, to order streets to be made, &c. and to sell the land, as they continue to do in relation to the commons in the rear of the city. Having power to sell, they could lawfully transact and compromise with other claimants of the same property; which has been done as above stated, and by which a new bank or levee has been made on the river, forming the quay or wharf of the port, the use of which is public and common to all. The second question must therefore be decid-

ed against the pretentions of the plaintiff on the batture as public property, and such as is *hors de commerce.*

As to his claim of a servitude—a right of way direct to the river and port: as the latter is now situated, we believe it to be wholly without legal foundation. Admitting the alluvion (as alleged in the petition) to have been entirely formed since the time when B. Gravier laid out the faubourg, it has been acquired either by the city or by the proprietors of the front lots. If by the latter, then the plaintiff, as owner of that part of it immediately in front of his lot, can have no servitude on it; for in order to constitute a servitude, it must have relation to two estates held by different owners—the *prædium dominans & prædium serviens.* If by the former, then it was acquired as common to all the inhabitants of the city, and no individual could in any manner obtain on it a right of servitude. While it remained common property, it was subjected to the use and service of all the citizens, which is wholly incompatible with the acquisition or existence of a particular servitude due to any individual of the corporation. Before the period when the alluvion was formed, no right of

servitude could have been acquired; and by
the allegations of the petition, which, so far as
they affect the claims of the plaintiff prejudici-
ally, must be taken to be true, no batture was
in existence at the time when Bertrand Gra-
vier sold the lots laid out on the front of his
plantation: consequently, by those sales, no
right of servitude could have been acquired
by the purchasers as incidental to the property
sold. We have shewn that he could not have
acquired any such right since that period. He
must be contented with the ordinary ways to
the river—the streets which are common to
all.

It is therefore ordered, adjudged and de-
creed that the judgment of the district court
be affirmed with costs.

*Hennen* for the plaintiff—*Hoffman* and
*Livermore* for the defendant.